UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAVID H. BAKER

        *Plaintiff,*

versus

STEVEN GEROULD, DAVID EGELSTON, CHARLES JOHNCOX, JAMES TUFFEY, DONALD SNELL, WALTER HEINRICH, ERIN CROTTY and LAWRENCE JOHNSON

        *Defendants.*

Civil Action
No. 03-CV-6558DGL(P)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF INDEPENDENT COUNSEL FOR DEFENDANTS

DOLIN, THOMAS & SOLOMON LLP
*Attorneys for Plaintiff*
135 Corporate Woods, Suite 130
Rochester, NY 14623
(585) 272-0540

Of Counsel:   J. Nelson Thomas
                  Michael J. Lingle

## PRELIMINARY STATEMENT

Whenever an attorney represents multiple clients, conflicts of interest among the clients must be addressed. In this case, the New York State Attorney General's Office (the "Attorney General") represents all of the defendants. This raises multiple conflicts of interest among the defendants and with their counsel including (i) conflicting desires to shift liability from themselves to other defendants; (ii) conflicting allegiances for the attorney with respect to the defendants; and (ii) conflicting interests between the Attorney General and the defendants.

Plaintiff raises this issue after his inability to resolve the matter with the Attorney General; because of plaintiff's attorney's ethical obligation to inform the court of potential conflicts of interest; and because plaintiff wants to insure a verdict will not be subject to collateral attack at a later date. Further, it is appropriate to address this issue prior to the investment of additional substantial time in this case and before depositions are conducted.

## FACTS

**Factual Background**

Plaintiff David Baker is a long-standing employee of the New York State Department of Environmental Conservation (the "DEC") and currently is a Supervising Environmental Conservation Officer with the rank of Lieutenant. (Complaint ¶ 4)

On the morning of March 6, 2002, Environmental Conservation Officer Bruce Bullock was involved in a snowmobile accident in which his vehicle crashed into a ditch. (Complaint ¶ 29) Officer Bullock informed his supervisor, plaintiff, about the accident. However, plaintiff was not allowed to examine the accident scene. Instead, many hours later,

defendant Gerould was asked to examine the scene by defendant Snell. (Complaint ¶¶ 33 – 35)

Defendant Gerould wrote a memo including his investigatory observations that the ditch was not visible from a distance greater than 100 feet, and that, if anything, with the greater snow cover present the morning of the accident, the ditch was probably even more difficult to observe. (Complaint ¶ 38) Plaintiff prepared his memorandum, noting defendant Gerould's observations about the visibility of the ditch. (Complaint ¶ 39)

The next day, defendant Gerould sent plaintiff a revised report in which all references to the difficulty seeing the ditch were removed and asked that all copies of the original memorandum be destroyed. (Complaint ¶¶ 41 – 42) Plaintiff sent an email to defendant Gerould, copying defendants Snell, Egelston and Johncox, asking why the information was removed. (Complaint ¶ 43) Minutes later, defendant Snell called plaintiff and informed plaintiff that defendant Egelston had ordered the material to be deleted and that plaintiff was required to make the same deletions. (Complaint ¶ 44) Defendant Johncox also sent an email to defendant Snell instructing defendant Snell to have plaintiff remove exculpatory references in the memorandum. (Complaint ¶ 45)

Plaintiff asked why defendants wanted the deletions made and defendant Snell replied that Albany had decided it wanted to go after Bullock by placing blame for the accident on Bullock. (Complaint ¶¶ 46 – 47)

Plaintiff exercised his First Amendment rights and protested the direction to alter his report, stating that altering such reports was illegal and unethical and that he would not follow such an order. (Complaint ¶¶ 48 – 51)

Defendant Snell told plaintiff that he was being insubordinate and ordered plaintiff to meet with defendant Snell that day. (Complaint ¶ 52) Plaintiff met with defendants Snell and Gerould that afternoon and was told that defendant Egelston had made the decision to have the reports changed and that defendant Snell was going to see that defendant Egelston's decision was enforced. (Complaint ¶ 56) Defendant Snell also stated that plaintiff would be brought up on charges of insubordination if he did not change his memorandum. (Complaint ¶ 58)

Plaintiff was also required to respond to an email from defendant Johncox demanding an explanation as to why plaintiff was being insubordinate. (Complaint ¶ 59) Defendant Johncox wrote to plaintiff that plaintiff had exercised extremely poor judgment in exercising his First Amendment rights and copying state officials on his email questioning the changes to defendant Gerould's report. (Complaint ¶ 60) Plaintiff wrote several emails and memoranda in response, explaining his opposition to the order given and agreeing to make the requested changes. (Complaint ¶ 62 – 63) Further, plaintiff made it clear that he would testify truthfully if questioned about the incident. (Complaint ¶ 65)

Several days later defendant Snell communicated to plaintiff that plaintiff's chance of receiving a promotion to Captain had disappeared because plaintiff had exercised his First Amendment rights even though plaintiff had previously been told that his chances of receiving that promotion were excellent. (Complaint ¶¶ 67 – 68) Ultimately, defendant Snell's threat turned true when the promotion to interim Captain was given to the individual who willfully altered his report, defendant Gerould, and not to plaintiff, although plaintiff was significantly better qualified. (Complaint ¶¶ 69 – 77)

Upon his promotion, defendant Gerould began retaliating against plaintiff. (Complaint ¶¶ 78 – 81) Finally, defendant Gerould was named permanent Captain of plaintiff's region. (Complaint ¶ 82 – 85)[1]

Sometime in late spring of 2004, defendant Tuffey issued a report concerning the Bullock investigation (the "Tuffey Report"). (Attached as <u>Exhibit B</u> to the Lingle Aff.) In his report, defendant Tuffey recommended that administrative action be taken against defendants Egelston and Johncox for their role in the incident, but largely exonerated the other defendants.

**Procedural Background**

Plaintiff Baker filed his complaint on November 6, 2003 against defendants Gerould, Egelston, Johncox, Tuffey, Snell, Heinrich, Crotty and Johnson for violations of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and the First Amendment to the Constitution of the United States of America. (Complaint ¶ 1) The Attorney General answered plaintiff's complaint on behalf of all of the named defendants in this action, thus indicating that the Attorney General is jointly representing all of the defendants named in the action. (Answers to Complaint)

Plaintiff's counsel is concerned about the potential conflicts of interest involved in the Attorney General's representation of all of the defendants in this case. (Lingle Aff. ¶ 4) Plaintiff's counsel raised the issue with defense counsel and served a discovery request on defendants in an attempt to identify the steps defense counsel had taken to alleviate the conflicts of interest among the defendants. (Plaintiff's First Set of Interrogatories, attached

---

[1] Plaintiff also testified at the arbitration conducted concerning officer Bullock's role in the snowmobile accident. Officer Bullock was exonerated by the arbitrator. The arbitrator's decision is attached to the affirmation of Michael J. Lingle ("Lingle Aff.") as <u>Exhibit A</u>.

- 4 -

as Exhibit C to the Lingle Aff.) Defense counsel objected the request and did not provide any responsive information. (Lingle Aff. ¶ 8; Defendants' Response to Plaintiff's First Set of Interrogatories, attached as Exhibit D to the Lingle Aff.) Plaintiff remains concerned that defense counsel has not resolved this critical issue with his clients, and plaintiff's counsel is obligated to bring this concern before the Court. (Lingle Aff. ¶ 10)

## ARGUMENT

Multiple representation inherently raises the issue of conflicts of interest among the jointly represented parties. "It is well settled that an attorney may not place himself in a position where a potential conflicting interest may, even inadvertently, affect or create the appearance of affecting his personal judgment or duty of undivided loyalty to his clients. Doubts as to the existence of a conflict of interest are to be resolved in favor of disqualification." *Death v. Salem*, 111 A.D.2d 778, 780 (2d Dep't 1985) (citations omitted). *See Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976) ("an attorney must avoid not only the fact, but even the appearance, of representing conflicting interests"). Plaintiff's counsel is under an ethical obligation to raise this issue. *See Dutton v. County of Suffolk*, 729 F.2d 903, 909 (2d Cir. 1984).

## POINT I
## DEFENDANTS' INTERESTS CONFLICT WITH THOSE OF THE STATE AND OF THE OTHER DEFENDANTS

A lawyer may not represent clients with differing interests unless the lawyer believes that a disinterested lawyer would believe that the lawyer can competently represent each of the parties. DR 5-105 provides:

> B.  A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be

-5-

adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5-105(C).

      C.   In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved.

This rule is further expanded upon by Ethical Consideration 5-1:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Neither the lawyer's personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to the client;

5-14:

> Maintaining the independence of professional judgment required of a lawyer precludes acceptance or continuation of employment that will adversely affect the lawyer's judgment on behalf of or dilute the lawyer's loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse or otherwise discordant;

and 5-15:

> If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with the likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially...

In *Dutton v. County of Suffolk*, the court found there to be a conflict of interest where the county attorney, in representing an officer and the county, argued that the officer was acting outside the official scope of his duties, thereby subjecting the officer to a punitive

damage award by a jury and protecting the county from liability. 729 F.2d at 906. The court found that as soon as the county attorney began to undermine the good faith immunity defense, the attorney was "not only failing to act as a conscientious advocate for [the officer] but was acting against [the officer's] interest" and that "[t]he seriousness of [the] conflict made disqualification appropriate." *Id.* at 908. Because the officer was not allowed to present the good faith immunity defense, the court found that the officer did not receive a fair trial. *See id.* at 909-10; *Ricciuti v. New York City Transit Authority*, 796 F.Supp. 84 (S.D.N.Y. 1992) (finding that a conflict exists even if individuals are only sued in their individual capacity because individual defendants can shift liability to the municipality even if they acted within the scope of their employment by establishing a good faith, qualified immunity defense; court required individual defendant be offered separate representation).

Similarly, in this case, the State may want to avoid paying any resulting damages. First, the State may want to argue the defendants were acting outside the scope of their employment. If the Court makes that finding, the defendants would be liable for any damages personally. Similarly, under Public Officer's Law § 17, as well as the State constitution and common law, the State cannot indemnify employees for punitive damages. Therefore, to the degree the Attorney General shifts blame to the defendants, the State saves money. Further, if the Attorney General's arguments shift damages from compensatory to punitive damages, the State again saves money. Additionally, the State has a basis for such an argument.

The State can rely on the Tuffey Report as evidence that Johncox and Egelston were acting outside of their official capacity. Because the Attorney General also represents the

interests of the State (New York is a client of the Attorney General's office), it will be impossible for him to both argue that Johncox and Egelston should not be liable for punitive damages and that punitive damages should be paid from the defendants' own pockets.

Further, any one defendant's damages depend on a jury's award of damages against it based on the evidence presented. Each defendant would want his lawyer to reduce his liability by making sure that the maximum liability is shifted to another one of defendants' counsel's clients. Even more, any single defendant may want to not simply shift damages but entire culpability to other defendants.

For example, given the strong evidence of defendants Snell's, Egelston's and Johncox's involvement in requiring plaintiff to change his memorandum, the other defendants may desire to shift as much liability to defendants Snell, Egelston and Johncox as possible, thus minimizing their own liability.

Further, as the Tuffey Report clearly shows, defendant Tuffey himself has found fault with the actions of Egelston and Johncox in this matter. At trial, defendant Tuffey will certainly argue that Egelston's and Johncox's mistakes are not his own and that if there is liability these defendants are therefore more culpable than he. This is particularly true because this case alleges a conspiracy amongst the defendants to deprive plaintiff of his civil rights. Certainly Tuffey will want to divorce his actions from those of the other defendants to refute this claim. However, any information Tuffey has concerning why he chose to recommend administrative action against Egelston and Johncox cannot be used by the Attorney General's office to assist Tuffey in his defense because that would disadvantage Egelston and Johncox.

In reverse, Egelston and Johncox will want to discredit defendant Tuffey, as well as his report. It would indeed be an awkward deposition—and an even more awkward trial—to have the same attorney simultaneously represent defendant Tuffey, and then impeach Tuffey and his findings. More than awkward, it would be an impossible task under the confidentiality and loyalty requirements of the ethical rules.

The report will have a further impact. Other defendants, including Gerould, Snell, Heinrich, Crotty and Johnson will likely also use the report and the facts in the report to shift culpability from themselves to others—particularly Johncox and Egelston, even though they did not author the report themselves. As with Tuffey, that would be a conflict for any joint counsel.

Additionally, those defendants not involved with establishing or enforcing the illegal policies might want to use evidence of the policies to limit their liability and deflect liability to those defendants responsible for establishing and enforcing such policies. And perhaps more importantly, the defendants not involved with establishing or enforcing such policies will need independent counsel capable of fully and completely investigating the discriminatory policies. Such investigation might include depositions of the defendants involved with establishing or enforcing the policies and paper discovery on the policies. As it currently stands, the Attorney General cannot conduct discovery against some of his clients for the benefit of his other clients. He is further conflicted in fully investigating such policies as the evidence uncovered would detrimentally affect some of his clients, to whom he owes a duty of loyalty, even though it would benefit other of his clients, to whom he also owes a duty of loyalty.

This conflict is irreconcilable for the Attorney General—he cannot possibly present evidence that places blame on another one of his clients, although that is exactly what is required under the ethical rules. Thus the Attorney General cannot represent the best interests of all of his clients in this matter. Each defendant is entitled to have its own counsel present its own best case. In this case, the Attorney General cannot zealously advocate for each defendant because of the conflicting interests among the defendants.

The conflicts discussed above simply demonstrate a few of the conflicts that will arise between the defendants. For example, it is not just that Johncox and Egelston will want to discredit Tuffey, it is also likely that Johncox will want to put more blame on Egelston (and as another example, Gerould) than he will want put on himself. Similarly, Crotty may want to distance herself from all defendants and have even more flexibility to fault Tuffey's report as not vigorous enough as part of her defense. Therefore, conflicts clearly arise between groups of defendants (e.g., Egelston and Johncox v. Tuffey), and these conflicts only highlight the types of conflicts between each of the defendants. Therefore, as set forth above, numerous conflicts result from the simultaneous representation by the Attorney General of the defendants in this case. This case does not rest on a one-size-fits-all defense.

## POINT II
## THE ATTORNEY GENERAL WILL EXPERIENCE CONFLICTING LOYALTIES TO THE DEFENDANTS

The cornerstone of a client's relationship with her attorney is being able to share her confidences and secrets with his attorney and for the client to enjoy unfettered allegiance of her attorney. *Booth v. Continental Insurance Co.*, 167 Misc.2d 429 (Sup. Ct. Westchester Cty. 1995) ("An attorney owes his client undivided loyalty and allegiance.").

The ethical rules governing lawyers recognize the importance of client confidences through Disciplinary Rule ("DR") 4-101. The general rule is that an attorney may not reveal confidences of a client:

> DR 4-101 Preservation of Confidences and Secrets of a Client
>
> A.   "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
>
> B.   Except as permitted under DR 4-101(C), a lawyer shall not knowingly:
>
> 1.   Reveal a confidence or secret of a client.
>
> 2.   Use a confidence or secret of a client to the disadvantage of the client.
>
> 3.   Use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

Ethical Consideration 4-1 further amplifies the importance of the preservation of client confidences:

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ the lawyer. *A client must feel free to discuss anything with his or her lawyer and a lawyer must be equally free to obtain information beyond that volunteered by the client.* A lawyer should be fully informed of all the facts of the matter being handled in order for the client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of independent professional judgment to separate the relevant from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of a client not only facilitates the full development of facts essential to proper representation of the client but also encourages non-lawyers to seek early legal assistance. (Emphasis added)

"Ethic Considerations 5-1 and 5-14 of the American Bar Association's Code of Professional Responsibility provide that the professional judgment of a lawyer must be exercised solely for the benefit of his client, free of compromising influences and loyalties, and this precludes acceptance of employment that will adversely affect his judgment or dilute his loyalty." *Cinema 5 Ltd.*, 528 F.2d at 1386.

However, when parties are jointly represented in the same matter, there is no expectation that confidences will be preserved among the attorney and each of the clients. Consequently, each individual client should expect that her secrets will be shared with the other jointly-represented clients.

In this case, one attorney jointly represents all of the defendants. As discussed above, for damages and liability purposes, the interests of the clients conflict. This conflict of interest also impacts a client's ability to speak candidly with his or her counsel.

As just one example, defendants Johncox and Egelston will want to contest the contents of the Tuffey Report. However, if they speak freely with the Attorney General, they know that such information will be shared with all of the other defendants. Johncox and Egelston cannot freely share what happened in this matter because if they discuss their personal involvement, those confidences will be shared with the other defendants and ultimately used against them by their own attorney when representing the co-defendants. Additionally, the defendants are aware that the confidences they share with their attorneys will be shared with their co-defendants who supervise them at higher levels in the chain of command. To the degree they want to confide in their attorney about their conduct in this matter, they know that everything they say about their conduct (good, bad or indifferent)

will be relayed to their supervisors. Therefore, the lower-level defendants will only feel comfortable telling their attorneys about part of the story—they cannot be totally candid with their attorney for fear of discipline.

This is just one of many examples which may arise in which some defendants would want information about others defendants' participation in the illegal activities in order to divert blame from themselves. Unless each defendant can state with assurance at this point that he is willing to fully support the conduct of all the other defendants in this case, then no defendant can feel comfortable communicating confidences with his attorney since those very confidences may be used against him at trial. *See* New York State Bar Opinion No. 555 (finding that lawyer jointly representing two partners cannot divulge one client's confidences to the other client to whom the information has importance when the confiding client requests strict confidentiality against the other and the lawyer should cease representation of both clients in partnership matters) *cited in Moore v Margiotta*, 581 F.Supp. 649, 652-53 (E.D.N.Y. 1984).

The ethical rules governing attorney conduct are designed to protect client confidences. In this case, defense counsel's clients cannot freely discuss their conduct with their attorney, thus depriving them of enjoying this essential client privilege.

### POINT III
### ATTORNEY GENERAL CANNOT ATTACK STATE REPORT

As noted above, the Tuffey Report will likely be used by defendant Tuffey (or the other defendants) to shift liability to defendants Egelston and Johncox.

However, additionally, the Attorney General experiences a conflict because he cannot on behalf of Egelston and Johncox attack the Tuffey Report. If he were to attack the report,

he would be accusing defendant Tuffey of lying and directly attacking the State, another of his clients.  Again, the Attorney General finds himself in the untenable position of not being able to zealously represent each of his clients as required by the ethical rules.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Attorney General be disqualified from representing all of the defendants in this action.

Dated:  November 30, 2004

                              **DOLIN, THOMAS & SOLOMON LLP**

                          By: *[signature]*
                              J. Nelson Thomas, Esq.
                              Michael J. Lingle, Esq.
                              *Attorneys for Plaintiff*
                              135 Corporate Woods, Suite 130
                              Rochester, New York 14623
                              Telephone:  (585) 272-0540
                              nthomas@theemploymentattorneys.com
                              mlingle@theemploymentattorneys.com